# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff/Respondent,** | ) | |
| **v.** | ) | **Case No. 08-4116-JAR** |
| | ) | **02-40098-01-JAR** |
| | ) | |
| **CORDELL NICHOLS,** | ) | |
| | ) | |
| **Defendant/Petitioner.** | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on petitioner Cordell Nichols' Motion under 28 U.S.C.

§ 2255 to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody (Doc. 350), as

amended and supplemented (Docs. 357, 385, 386).  In his motion, Nichols seeks relief on

numerous grounds that he was denied effective assistance of counsel.  The government has

responded (Doc. 363) and Nichols has filed a traverse (Doc. 373).  After a careful review of the

record and the arguments presented, the Court denies Nichols' motion without further

evidentiary hearing.

## I.      Legal Standards

Under § 2255(a):

> A prisoner in custody under sentence of a court established by Act
> of Congress claiming the right to be released upon the ground that
> the sentence was imposed in violation of the Constitution or laws
> of the United States, or that the court was without jurisdiction to
> impose such sentence, or that the sentence was in excess of the
> maximum authorized by law, or is otherwise subject to collateral
> attack, may move the court which imposed the sentence to vacate,
> set aside or correct the sentence.

According to Rule 4(b) of the Rules Governing Section 2255 Proceedings for the United States

District Courts:

> The judge who receives the motion must promptly examine it. If it
> plainly appears from the motion, any attached exhibits, and the
> record of prior proceedings that the moving party is not entitled to
> relief, the judge must dismiss the motion. . . .

An evidentiary hearing must be held on a § 2255 motion "unless the motion and files and records of the case conclusively show that the prisoner is entitled to no relief."[1] Petitioner must allege facts which, if proven, would warrant relief from his conviction or sentence.[2] An evidentiary hearing is not necessary where the factual allegations in a § 2255 motion are contradicted by the record, inherently incredible, or when they are conclusions rather than statements of fact.[3]

Finally, Nichols appears *pro se*. Therefore, his pleadings are to be construed liberally and not to the standard applied to an attorney's pleadings.[4] If a petitioner's motion can be reasonably read to state a valid claim on which he could prevail, the court should do so despite a failure to cite proper legal authority or follow normal pleading requirements.[5] However, it is not "the proper function of the district court to assume the role of advocate for the *pro se* litigant."[6] For that reason, the court shall not supply additional factual allegations to round out a

---

[1] 28 U.S.C. § 2255(b)

[2] See *Hatch v. Oklahoma*, 58 F.3d 1447, 1471 (10th Cir. 1995), *cert. denied*, 517 U.S. 1235 (1996).

[3] *Arredondo v. United States,* 178 F.3d 778, 782 (6th Cir. 1999) (quoting *Engelen v. United States*, 68 F.3d 238, 240 (8th Cir. 1995)); *see also Hatch*, 58 F.3d at 1471 ("the allegations must be specific and particularized, not general or conclusory"); *United States v. Fisher*, 38 F.3d 1144, 1147 (10th Cir. 1994) (rejecting ineffective assistance of counsel claims which are merely conclusory in nature and without supporting factual averments).

[4] *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

[5] *Id.*

[6] *Id.*

2

petitioner's claims or construct a legal theory on his behalf.[7]

## II. Procedural Background

On June 9, 2003, Nichols was convicted by a jury of one count of possession with intent to distribute approximately 4.6 kilograms of heroin, in violation of 21 U.S.C. § 841(a)(1); and one count of conspiracy to distribute in excess of one kilogram of heroin, in violation of 21 U.S.C. § 846.[8] The Presentence Investigative Report (PSIR) indicated that Nichols was subject to a statutory mandatory minimum of 20 years as a result of an Information filed pursuant to 21 U.S.C. § 851(a)(1), based on a prior felony conviction for possession of cocaine.[9] On September 8, 2003, this Court sentenced him to 360 months' imprisonment, followed by ten years of supervised release.[10]

Nichols filed a direct appeal of his conviction and sentence to Tenth Circuit Court of Appeals. In that appeal, he argued: (1) evidence seized following two traffic stops should have been suppressed because the stops violated the Fourth Amendment; (2) testimony regarding a third traffic stop should have been held inadmissible under Fed. R. Evid. 404(b); (3) a DEA agent's testimony regarding allegedly threatening statements made by Nichols at the time of his arrest should also have been held inadmissible under Rule 404(b); and (4) there was insufficient evidence to support Nichols' conspiracy conviction.[11] In *Nichols I*, the court considered each of

---

[7]*See Whitney v. State of New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997).

[8](Doc. 190.)

[9](PSIR at ¶ 104.)

[10](Doc. 271.)

[11]*United States v. Nichols*, 374 F.3d 959, 961 (10th Cir. 2004), *vacated by* 543 U.S. 1113 (2005) (hereinafter "*Nichols I*").

these grounds, and affirmed Nichols' convictions and sentence.[12]

Following the Tenth Circuits' affirmance of his sentence in *Nichols I*, Nichols filed a petition for writ of certiorari with the Supreme Court, asking that his sentence be vacated on *United States v. Booker* [13] grounds. While his direct appeal was pending, on June 7, 2004, Nichols filed a Motion for Relief from Judgment, Pursuant to Rule 60(b)(2), Newly Discovered Evidence.[14] Nichols based his motion on his contention that Trooper Michael Weigel falsely testified at the March 3, 2003 suppression hearing in this case concerning his claim that he had been investigating an injury accident in the early morning hours of May 22, 2002.[15] This Court denied Nichols' motion, and specifically declined to characterize his motion as filed under 28 U.S.C. § 2255.[16] On January 24, 2005, the Supreme Court granted certiorari, vacated the *Nichols I* opinion, and remanded the case to the Court of Appeals for further consideration in light of *Booker*.[17] On June 7, 2005, the Tenth Circuit reinstated its opinion affirming Nichols' conviction and remanded the case to this Court for resentencing.[18]

On June 23, 2005, Nichols filed a motion for a new trial, pursuant to Rule 33(b)(1) of the Federal Rules of Criminal Procedure, based on newly discovered evidence. In this motion,

---

[12]*Id.*

[13]543 U.S. 220 (2005).

[14](Doc. 250.)

[15]*Id.* at 4-5, Apps. B & C.

[16](Doc. 253, at 1-3.)

[17]*See Nichols v. United States*, 543 U.S. 1113 (Jan. 24, 2005).

[18]*See United States v. Nichols*, 410 F.3d 1186 (10th Cir. Jun. 7, 2005.) ("Accordingly, our previous opinion affirming Nichols' conviction is REINSTATED, and the case is REMANDED to the district court for resentencing.").

Nichols again argued that Trooper Weigel testified falsely concerning his claim that he had been investigating an injury accident in the early morning hours of May 22, 2002.[19]

This Court resentenced Nichols on March 7, 2006.[20]  At this hearing, Nichols pressed his claim for relief under Rule 33 based on his allegation that Trooper Weigel had testified falsely. After his counsel conceded that these claims were not properly before it on remand for resentencing, this Court denied Nichols' motion for a new trial.[21] Nichols re-asserted his objections to certain proposed enhancements, including the two-point enhancement for possession of a firearm and the two-point enhancement for obstruction of justice.[22]  This Court noted these objections, but overruled them for the same reasons it overruled them at Nichols' initial sentencing on September 8, 2003.[23]  This Court found that Nichols' total offense level was 38, and his criminal history category was IV, resulting in an advisory Guidelines range of 324-405 months.[24]  This Court then sentenced Nichols to 360 months'custody on Counts 1 and 2, to run concurrently.[25]

Following the sentencing hearing, this Court issued a written order memorializing its findings.[26]  In this order, the Court discussed the merits of Nichols' Rule 33 motion, and found

---

[19](Docs. 268-271.)

[20](Doc. 300.)

[21]*Id*. at 8.

[22]*Id*. at 10-12.

[23]*Id*. at 12; *see also* Doc. 264 at 39-40, 42-46.

[24](Doc. 200 at 19.)

[25]*Id*. at 30.

[26](Doc. 289.)

his claim of newly discovered evidence did not warrant a new trial.[27]  In so ruling, this Court found that "[t]he evidence offered by the defendant is, at best, merely impeaching," and that "the evidence would not produce an acquittal."[28]  This Court also found that the government did not withhold the evidence in violation of *Brady v. Maryland*.[29]

Nichols appealed his March 7, 2006 sentence to the Tenth Circuit.[30]  The Court of Appeals considered Nichols' claim of *Booker* error and rejected it on the merits, finding both that "the district court properly found by a preponderance of the evidence that the two enhancements were warranted,"[31] and that Nichols' Confrontation Clause rights were not violated by this Court's reliance on statements attributed to Nichols' girlfriend, Sheneice Sanders, in the PSIR.[32]  Nichols appealed this decision to the Supreme Court, but the Court denied his petition for certiorari on October 1, 2007.[33]  On October 6, 2008, Nichols filed the instant motion, alleging numerous instances of ineffective assistance of counsel.

## III.    Facts of the Case and Trial Proceedings

Because of the expansive nature of Nichols' claims, a review of the underlying facts and background of the case and trial is informative.

### *The Wyoming Stop*

---

[27]*Id*. at 3-4.

[28]*Id*. at 3.

[29]*Id.* at 4.

[30]*See United States v. Nichols*, 219 F. App'x. 770 (10th Cir. Mar. 7, 2007) (hereinafter "*Nichols II*").

[31]*Id*. at 774.

[32]*Id*.

[33]*See Nichols v. United States*, 128 S. Ct. 329 (Oct. 1, 2007).

On October 12, 1999, Trooper William Morse of the Wyoming Highway Patrol was working the evening shift on Interstate 80 when he saw a vehicle traveling unusually slowly and weaving across the center line of the highway.[34] Concerned that the driver might be impaired, Trooper Morse stopped the vehicle.[35] Trooper Morse saw that the driver was the sole occupant of the vehicle and, immediately upon approaching the vehicle, smelled the odor of burning marijuana.

Trooper Morse contacted the driver and asked for identification, registration, and insurance documents.[36] The driver, who ultimately was determined to be Nichols, produced a fictitious Missouri ID card that identified him as "Charles Rhodes."[37] Trooper Morse, who immediately detected the odor of marijuana coming from the vehicle, also saw that the driver appeared to have loose marijuana scattered over himself and throughout the front seat of the car, as if he had been trying to eat the marijuana in an effort to destroy it or to conceal it from the trooper.[38] When asked, "Rhodes" told the trooper that he was driving from Louisiana to Sacramento, California.[39]

At this point, Trooper Morse arrested "Rhodes" for possession of marijuana and for suspicion of providing a false name.[40] While conducting a patdown search of Nichols, Trooper

---

[34](Doc. 236 at 47-49.)

[35]*Id*. at 50.

[36]*Id*. at 51.

[37]*Id*. at 51-52.

[38]*Id*. at 51, 54-55.

[39]*Id*. at 57.

[40]*Id*. at 58.

Morse found a large roll of cash, ultimately determined to be nearly $13,000, in his front pants pocket.[41]  When asked, Nichols explained that he had won the money gambling but had no documentation of the source of the money.[42]  Trooper Morse also checked the registration of the vehicle and found that it belonged to Rafael Navarez of Sacramento.[43]  Nichols was then taken to jail, and Trooper Morse turned the case over to agents from the Wyoming Division of Criminal Investigations ("DCI").[44]

The following day, Special Agent Robert Lezanby of the Wyoming DCI became involved in the case.[45]  Because of the tattoo "Dell" on Nichols' neck, Agent Lezanby agreed with Trooper Morse that Nichols' true name likely was not Charles Rhodes.[46]  When Agent Lezanby told Nichols that he intended to obtain a full set of fingerprints, Nichols admitted that his true name was Cordell Nichols.[47]  During the search of the car Nichols had been driving, Agent Lezanby found a false compartment built into the back of each front seat.[48]  Finally, Agent Lezanby contacted the Casino Queen, where Nichols claimed to have won the cash in his possession, and was told there were no records that either Charles Rhodes or Cordell Nichols had

---

[41] *Id*. at 58-59.

[42] *Id*. at 59-60.

[43] *Id*. at 60.

[44] *Id*.

[45] *Id*. at 70.

[46] *Id*. at 72-73.

[47] *Id*.

[48] *Id*. at 76-77.

won a significant amount of money during the time period in question.[49]

As a result of this stop and the ensuing investigation, Nichols was charged with possession of marijuana, interference with lawful police duties, driving under suspension, and a lane violation.[50]  A forfeiture action was also filed against the money.[51]  Nichols ultimately pled guilty to the interference charge, the driving under suspension charge, and the lane violation, in exchange for dismissal of the marijuana charge.[52] An agreement was reached in the forfeiture case, whereby the State of Wyoming kept just under half of the money, and the balance was returned to defendant. [53]

### The St. Louis Stop and Resulting Apartment Search

On September 14, 2000, agents with the St. Louis DEA Drug Task Force received information from a reliable source that several individuals, including Nichols, planned to travel to the area of San Francisco, California, to purchase heroin.[54]  The informant told agents that the group planned to leave at approximately 7:00 p.m. that evening in a green Land Rover, and that they planned to travel west on Interstate 70 ("I-70") from St. Louis.[55]  Agents initiated surveillance and, at approximately 7:15 p.m., they saw a green Land Rover traveling westbound

---

[49]*Id*. at 80.

[50]*Id*. at 65.

[51]*Id*.

[52]*Id*.

[53]*Id*. at 74.

[54](Doc. 235 at 253-55.)

[55]*Id*.

on I-70 near Lambert International Airport.[56]  While following the vehicle, officers observed it speed in excess of the posted speed limit and change lanes without signaling, both in violation of Missouri law.[57]  Two officers stopped the vehicle; upon approaching it, they smelled the odor of marijuana coming from the vehicle.[58]  The officers immediately arrested the occupants of the vehicle for possession of a controlled substance.[59]

One of the occupants of the vehicle was determined to be defendant Nichols.[60]  Another identified himself as "Tyrone Greene," but was later determined to be co-defendant Tristin Mitchell.[61]  Inside the rented vehicle agents found eight small bags of marijuana.[62]  Inside a suitcase belonging to Nichols, the agents found $5,700 in cash.[63]

Based upon interviews conducted after the arrest, agents determined that Nichols had been using an apartment in St. Louis for the purpose of storing and selling heroin.[64]  The agents went to the apartment and spoke with Nichols' girlfriend, Sheneice Sanders, who leased the apartment and lived there with him.[65]  The agents sought and received consent from Sanders to

---

[56]*Id*. at 255-58.

[57](Doc. 175 at 65-66.)

[58]*Id*. at 67.

[59]*Id*. at 67-68.

[60]*Id*. at 68.

[61]*Id*.

[62](Doc. 235 at 266.)

[63]*Id*. at 263; Doc. 175 at 72.

[64](Doc. 175 at 73-74; Doc. 235 at 275-76.)

[65]*Id*. at 74; Doc. 235 at 276.

search the apartment.[66]  During the search they found approximately two ounces of "black tar"

heroin, two .380 caliber semi-automatic handguns, two boxes of ammunition for the handguns,

numerous items associated with the distribution of heroin,[67] and $2,700 in cash. [68]  One of the

handguns was found in the same dresser drawer as the heroin.[69]  A latent fingerprint was

developed from one of the items of drug paraphernalia, a grinder commonly used to grind heroin

into user-quantities before it is packaged into capsules and distributed, and this print was

subsequently matched to the known fingerprints of Nichols.[70]  At the jury trial, Donna Knight, an

expert fingerprint examiner for the St. Louis County Police Department, testified that she

compared the known fingerprints of Nichols to the fingerprint on the grinder and determined that

it was his fingerprint.[71]  No charges were filed, either in federal court or state court as a result of

this investigation.[72]

### The Kansas Stop

At approximately 7:15 a.m. on May 22, 2002, Trooper Mike Weigel of the Kansas

Highway Patrol was working I-70 when he saw a passenger car following a recreational vehicle

---

[66]*Id.*

[67]These items included a coffee grinder, which is commonly used to grind solid chunks of heroin into a powder for packaging, and empty capsules, into which the heroin powder is placed for dose-by-dose sale to individual users. (Doc. 235 at 276-78.)

[68](Doc. 235 at 276-307.)

[69]*Id.* at 305.

[70](Doc. 175 at 77.)

[71](Doc. 236 at 33-35, 39-41.)

[72](Doc. 235 at 321-22.)

("RV") too closely.[73]  On three separate occasions, Trooper Weigel used a stopwatch to determine that the passenger car was within two seconds of the rear bumper of the RV.[74] Following another vehicle too closely is a violation of Kansas law,[75] and Trooper Weigel believed that the driver had violated this law.[76]

Trooper Weigel stopped the vehicle for these offenses and spoke to the driver, who identified himself as Tristin Mitchell, and said he did not have a driver's license.[77]  Trooper Weigel identified the two passengers as Kristin White and Nichols, who  falsely identified himself as "Quindell Johnson."[78]  Nichols stated that he did not have a valid drivers license.[79] The occupants advised the trooper that the vehicle was a rental car and provided a copy of the rental contract, which showed that "Angela McCauley" rented the vehicle for one day on May 15, 2002, in Sacramento, California.[80]  The rental agreement indicated the vehicle was not to be taken outside the State of California, and the only authorized driver on the rental agreement was the person who rented the vehicle, McCauley.[81]  White told Trooper Weigel that her aunt had

---

[73](Doc. 234 at 74-78.)

[74]*Id*. at 80-86.

[75]*Id*. at 82.

[76](Doc. 175 at 111.)

[77]*Id*. at 106.

[78]*Id*. at 107.

[79]*Id*. at 106-08.

[80]*Id*. at 108-09.

[81]*Id*. at 109.

rented the vehicle and she had obtained a one-week extension of the rental.[82]

While Trooper Weigel talked with Mitchell, he had his dispatcher run checks on the three individuals, the vehicle, and the person who rented the vehicle.[83]  The dispatcher informed Trooper Weigel that Mitchell had a prior drug arrest and that McCauley also had a criminal record.[84]

Trooper Weigel informed Mitchell that he intended to issue Mitchell a warning for the traffic violation and the license violation, and that the three would be free to leave.[85]  Trooper Weigel then spoke with White and told her she would have to drive since she was the only occupant who had a valid driver's license.[86]  The stop was videotaped and this Court admitted it into evidence at the suppression hearing.[87]

Trooper Weigel asked White whether he could ask her some additional questions, adding that he was finished with the traffic stop.[88] White responded affirmatively.[89]  Trooper Weigel asked White whether there were any drugs, guns, or explosives in the vehicle; she said no.[90] Trooper Weigel then asked her if he could look into the trunk of the vehicle, and White

---

[82]*Id.* at 113.

[83]*Id.* at 109.

[84]*Id.* at 114.

[85]*Id.* at 115.

[86]*Id.* at 109, 115.

[87]*Id.* at 120.

[88]*Id.* at 112-13, 115.

[89]*Id.* at 115.

[90]*Id.*

responded, "Sure."[91]

Less than thirty seconds after opening the trunk, Trooper Weigel found a sack of marijuana "laying right there in the trunk."[92]  He then arrested Nichols, Mitchell, and White.[93] Trooper Weigel continued his search and found several bundles of a dark substance that he thought was heroin.[94]  Subsequent analysis of the items that Trooper Weigel believed were drugs showed they were actually several small bags containing marijuana and a large bag containing approximately 4.8 kilograms of heroin.[95]

### *Federal Charges and Prosecution*

On July 31, 2002, Nichols, White, and Mitchell were indicted in federal court on a single count of possession with intent to distribute approximately 4.6 kilograms of heroin on May 22, 2002.[96]  On November 7, 2002, after the DEA agents in Kansas learned of the prior drug trafficking activities of Mitchell and Nichols, the grand jury returned a Superseding Indictment,[97] which added a count of conspiracy to traffic heroin, from the time of Nichols' stop in Wyoming, through and including the time of the stop of Nichols and Mitchell and the resulting search of Nichols' apartment in St. Louis, up to the time of the Kansas stop.[98]

---

[91]*Id*. at 116.

[92]*Id*. at 117.

[93]*Id*. at 118.

[94]*Id*.

[95](Doc. 235 at 231-16.)

[96](Doc. 1.)

[97](Doc. 81.)

[98]*Id*.

Nichols filed two motions seeking suppression of evidence.[99]  The motions targeted the heroin seized by Trooper Weigel during the Kansas traffic stop and the money, heroin, guns, and paraphernalia seized a few months earlier in St. Louis.  After conducting an evidentiary hearing, this Court denied both motions.[100]

Prior to trial, Nichols filed a motion *in limine* seeking to exclude any testimony regarding the 1999 traffic stop in Wyoming, arguing that the stop was extrinsic to the crime charged.[101]  This Court addressed the motion at a hearing just prior to trial and denied it.[102]  At that hearing, Nichols' counsel, James Chappas, was permitted to withdraw as counsel of record and was appointed standby counsel.[103]

Jury trial in the case began June 2, 2003.[104]  The day before, the government filed an Information pursuant to 21 U.S.C. § 851, which stated that upon conviction of either Count 1 or Count 2 of the Superseding Indictment, Nichols shall be sentenced to increased punishment by reason of a prior felony conviction for possession of a controlled substance in St. Louis, Missouri in June 1992.[105]

Nichols represented himself, and Chappas sat at the defense table as standby counsel during the duration of the trial.  Over Nichols' objection, the government offered testimony

---

[99](Docs. 26, 154.)

[100](Doc. 157.)

[101](Doc. 172.)

[102](Doc. 185.)

[103]*Id.*

[104](Doc. 187.)

[105](Doc. 182.)

during its case-in-chief regarding threats Nichols made against one of the agents who arrested him in St. Louis on the warrant from the instant charges.[106]  The government notified the trial court, outside the presence of the jury, of its intent to offer this evidence and its theory that the testimony constituted evidence of consciousness of guilt.[107]  The government proffered its evidence to the Court and, after Nichols objected, the Court conducted an appropriate analysis under Fed. R. Evid. 401 and 403.[108]  This Court ultimately overruled Nichols' objection, and the testimony was admitted.[109]

The trial concluded on June 9, 2003, with the jury finding Nichols guilty of both counts of the Superseding Indictment.[110]  Co-defendant Mitchell was acquitted of the conspiracy charge but convicted of the count of possession with intent to distribute heroin.[111]  Co-defendant White was acquitted on both counts.[112]  Nichols was subsequently represented at sentencing and on appeal by Stephen Kessler.

## IV.  Discussion

### A.  Statute of Limitations

The Court first considers the government's argument that Nichols' motion should be dismissed because he filed it outside of the applicable statute of limitations and does not carry

---

[106](Doc. 235 at 229-31.)

[107]*Id.*

[108]*Id.*

[109]*Id.* at 231.

[110](Doc. 187.)

[111]*Id.*

[112]*Id.*

16

his burden under the "prison mailbox rule." Nichols' § 2255 motion is governed by the

Antiterrorism and Effective Death Penalty Act ("AEDPA"), which establishes a one-year

limitations period for federal prisoners seeking habeas relief.[113] This statute provides that a

defendant has one year from the date his judgment of conviction became final to file his § 2255

motion.[114] In this case, Nichols' judgment of conviction became final on October 1, 2007, when

the Supreme Court denied his petition for certiorari seeking to appeal the Tenth Circuit's

affirmance of his sentence in *Nichols II*.[115] Thus, for Nichols' motion to be considered timely

filed, it must have been filed by October 1, 2008.

Nichols filed his motion on October 6, 2008, so it was untimely unless he can take

advantage of the "prison mailbox rule." "The prison mailbox rule . . . holds that a pro se

prisoner's [filing] will be considered timely if given to prison officials for mailing prior to the

filing deadline, regardless of when the court itself receives the documents."[116] Under this rule,

an inmate may establish timely filing by either

> (1) alleging and proving that he or she made timely use of the
> prison's legal mail system if a satisfactory system is available, or
> (2) if a legal system is not available, then by timely use of the
> prison's regular mail system in combination with a notarized
> statement or a declaration under penalty of perjury of the date on
> which the documents were given to prison authorities and attesting

---

[113]*See* 28 U.S.C. § 2255, ¶ 6.

[114]*Id.* at ¶ 6(1).

[115]*Nichols v. United States*, 128 S. Ct. 329 (Oct. 1, 2007); *see United States v. Willis*, 202 F.3d 1279, 1280-81 (10th Cir. 2000) (holding "a judgment of conviction is final for purposes of the one-year limitation period in § 2255 when the United States Supreme Court denies a petition for writ of certiorari after a direct appeal, regardless of whether a petition for rehearing from the denial of certiorari is filed").

[116]*Price v. Philpot*, 420 F.3d 1158, 1163-64 (10th Cir. 2005) (internal citations omitted); *see also United States v. Gray*, 182 F.3d 762, 765 n.4 (10th Cir. 1999) (holding that prison mailbox rule applies to § 2255 motions).

that postage was prepaid.[117]

A prison legal mail system is one in which "prison authorities log in all legal mail at the time it is received."[118]

Although Nichols represents that he placed the motion "in the prison mailing system on September 23, 2008,"[119] the clerk's notation when docketing the motion indicates the envelope from U.S.P. Terre Haute, Indiana was placed in the mail on September 30, 2008.  Accordingly, because he made timely use of the prison's legal mail system, the Court finds that Nichols has carried his burden under the prison mailbox rule and his motion should be deemed as timely filed.

## B.    Ineffective Assistance of Counsel

Nichols makes numerous claims alleging that his counsel provided ineffective assistance at various stages of these proceedings.  In his original motion, Nichols cites five grounds of ineffective assistance, and each cited ground contains numerous subsidiary claims.  Nichols also moves to amend his motion to add an additional claim.  The Court considers each claim in turn.

### *Standards*

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense."[120]  A successful claim of ineffective assistance of counsel must meet the two-pronged test set forth in *Strickland v.*

---

[117]*Price*, 420 F.3d at 1166.

[118]*Gray*, 182 F.3d at 765

[119](Doc. 350 at 21.)

[120]U.S. Const. amend. VI; *Kansas v. Ventris*, — U.S.—, 129 S. Ct. 1841 (2009).

*Washington*.[121]  First, a defendant must show that his counsel's performance was deficient in that it "fell below an objective standard of reasonableness."[122]  To meet this first prong, a defendant must demonstrate that the omissions of his counsel fell "outside the wide range of professionally competent assistance."[123]  This standard is "highly demanding."[124]  Strategic or tactical decisions on the part of counsel are presumed correct, unless they were "completely unreasonable, not merely wrong, so that [they] bear no relationship to a possible defense strategy."[125]  In all events, judicial scrutiny of the adequacy of attorney performance must be strongly deferential: "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[126]  Moreover, the reasonableness of the challenged conduct must be evaluated from counsel's perspective at the time of the alleged error; "every effort should be made to 'eliminate the distorting effects of hindsight.'"[127]

Second, a defendant must also show that his counsel's deficient performance actually prejudiced his defense.[128]  To prevail on this prong, a defendant "must show there is a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would

---

[121]466 U.S. 668 (1984).

[122]*Id*. at 688.

[123]*Id*. at 690.

[124]*Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986).

[125]*Fox v.Ward*, 200 F.3d 1286, 1296 (10th Cir. 2000) (quotation and citations omitted).

[126]*Strickland*, 466 U.S. at 689.

[127]*Edens v. Hannigan*, 87 F.3d 1109, 1114 (10th Cir. 1996) (quoting *Strickland*, 466 U.S. at 689).

[128]*Strickland*, 466 U.S. at 687.

have been different."[129]  A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome."[130]  This, in turn, requires the court to focus on "the question whether counsel's deficient performance render[ed] the result of the trial unreliable or the proceeding fundamentally unfair."[131]  A defendant must demonstrate both *Strickland* prongs to establish a claim of ineffective assistance of counsel, and a failure to prove either one is dispositive.[132]

### 1.      Failure to conduct pre-trial discovery

Nichols alleges that his counsel was ineffective "for failure to conduct any pre-trial discovery . . . and to require the government to turn over 'material' items of evidence in their possession; or to interview potential witnesses for the defense," including Sheneice Sanders and informant Damon Campbell.  The Court agrees with the government that these bare allegations are insufficient to constitute a cognizable claim of ineffective assistance of counsel.  "An analysis of an ineffective assistance of counsel claim begins with the presumption that trial counsel was competent to provide the guiding hand that the accused needed, and therefore the burden is on the accused to demonstrate both a deficient performance and resulting prejudice."[133]  The

---

[129]*Id*. at 694.

[130]*Id*.

[131]*Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

[132]*Smith v. Robbins*, 528 U.S. 259, 286 n.14 (2000) (quoting *Strickland*, 466 U.S. at 697) ("The performance component need not be addressed first. 'If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'"); *see also Romano v. Gibson*, 239 F.3d 1156, 1181 (10th Cir. 2001) ("This court can affirm the denial of habeas relief on whichever *Strickland* prong is the easier to resolve.").

[133]*Gilson v. Sirmons*, 520 F.3d 1196, 1245 (10th Cir. 2008).

defendant must prove this burden by a preponderance of the evidence.[134]  Because Nichols does

not explain how these "'material' items of evidence" or witness statements were material or

relevant, he cannot claim that his counsel was ineffective in failing to obtain them.  Nor does he

explain how, if obtained, these items and statements would have changed the result of his trial.

In the absence of such explanations, Nichols does not sustain his burden to demonstrate either

deficient performance or resulting prejudice, and this claim must fail.

### 2. Prosecutorial misconduct resulting in a *Brady* violation

Nichols claims that the government withheld exculpatory and impeaching information

relating to Trooper Weigel's stop on May 22, 2002.  Specifically, Nichols claims that Weigel's

testimony that he had been investigating an injury accident prior to making the Kansas traffic

stop was false, and this alleged perjury cast doubt on his credibility.

The Fifth Amendment provides no person shall be deprived of liberty without due

process.[135]  In *Brady v. Maryland*,[136] the Supreme Court held the government's suppression of

evidence favorable to the accused violates due process where the evidence is material to guilt or

punishment.  In *Giglio v. United States,*[137] the Supreme Court extended *Brady* to require the

government to disclose impeachment evidence as well as exculpatory evidence.  To establish a

*Brady* violation, a habeas petitioner must demonstrate: (1) the evidence at issue is favorable to

him because it is exculpatory or impeaching; (2) the government suppressed the evidence; and

---

[134]*Sallahdin v. Mullin*, 380 F.3d 1242, 1248 (10th Cir. 2004) ("To surmount the strong presumption of reasonable professional assistance, a criminal defendant bears the burden of proving, by a preponderance of the evidence, that his trial counsel acted unreasonably.").

[135]U.S. Const. amend. V.

[136]373 U.S. 83, 87 (1963).

[137]405 U.S. 150, 154 (1972).

(3) prejudice ensued from the suppression, *i.e.*, the suppressed evidence was material to guilt or punishment.[138]

Impeachment evidence must be material before its suppression justifies a new trial.[139] Evidence is material if there is a reasonable probability its disclosure would have produced a different outcome.[140] A "reasonable probablility" of a different result is shown when the government's failure to disclose evidence "undermines confidence in the outcome of the trial."[141] "The question is not whether the defendant would more likely than not have received a different verdict with respect to the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."[142] The Court must evaluate the strength of the impeachment evidence and the effect of its suppression in the context of the entire record to determine its materiality."[143]

The government's suppression of impeachment evidence can warrant a new trial "where the evidence is highly impeaching or when the witness' testimony is uncorroborated and essential to the conviction."[144] Suppressed evidence is immaterial under *Brady*, however, if the evidence is cumulative or impeaches on a collateral issue.[145] Similarly, suppressed impeachment

---

[138]*Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

[139]*Wood v. Bartholomew*, 516 U.S. 1, 5 (1995) (*per curriam*).

[140]*See United States v. Bagley*, 473 U.S. 667, 682 (1985).

[141]*Id*. at 678.

[142]*Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

[143]*Bagley*, 473 U.S. at 683.

[144]*United States v. Martinez-Medina*, 279 F.3d 105, 126 (1st Cir.), *cert. denied*, 536 U.S. 932 (2002).

[145]*United States v. Page*, 808 F.2d 723, 730 (10th Cir.), *cert. denied*, 482 U.S. 918 (1987).

evidence has little probative value if additional evidence strongly corroborates the witness's testimony the suppressed evidence might have impeached.[146]

This Court previously considered this claim in the context of Nichols' Rule 60 and Rule 33 motions and twice rejected it on the merits.[147]  The Court found that any evidence withheld was "at best, merely impeaching" and "the evidence would not produce an acquittal."[148]  This Court further found that the government did not violate *Brady* because "the evidence noted by defendant is simply insufficient to constitute material evidence, as the Court is convinced that there is no reasonable probability this evidence would have affected the outcome of his trial."[149]  The Court adopts its previous rulings as a basis to deny Nichols' claim and hereby incorporates them by reference.   While the allegedly suppressed evidence would certainly be impeaching, it in no way rises to the level of exculpatory evidence, which is defined as evidence that is material to the issue of guilt or innocence.[150]  Although Nichols does not articulate how counsel was ineffective with respect to this claim, the Court's previous findings foreclose any success on the second *Strickland* prong relating to prejudice, and this claim fails.

### 3.    Fingerprint evidence

Nichols contends that "[t]he government violated his Due Process rights by failing to turn over the 'Report of Finger Print Examiner' Mr. Thomas Krull," failing to turn over pictures of the print, and failing to call Krull at trial.  He also claims the government "lied to the defendant

---

[146]*See Strickler v. Greene*, 527 U.S. 263, 292-94 (1999).

[147](Doc. 289.)

[148]*Id*. at 3.

[149]*Id*. at 4.

[150]*Bagley*, 472 U.S. at 676.

on record stating Mr. Thomas Krull was deceased and could not be called as a witness." The Court agrees with the government that this claim is overstated.

Contrary to Nichols' assertion, at no time did the government represent that Krull was deceased. As the government explained at trial in Nichols' presence, it did not call Krull because he made his original fingerprint comparison "based off an old fingerprint card that was completed by an agent who is now deceased."[151] Agent Wurdeman further explained to Nichols on cross-examination that "when you were arrested in St. Louis three years ago, the jailer that took your fingerprints has since deceased. [sic]"[152] To remedy this situation, the government had CCA jailer James Hughes obtain another set of fingerprints from Nichols, which was admitted at trial as Government Exhibit 66.[153] At the jury trial, Donna Knight, an expert fingerprint examiner for the St. Louis County Police Department, testified that she compared the known fingerprints of Nichols on Government Exhibit 66 to the fingerprint on the grinder and determined that it was Nichols' fingerprint.[154] She explained that Krull had made a previous fingerprint comparison off of the old fingerprint card that had been obtained from Nichols by the now-deceased jailer, so she did another comparison with Government Exhibit 66.[155] In testifying that Nichols' print from Government Exhibit 66 matched his fingerprint on the coffee grinder, the government introduced a photograph of the latent print from the coffee grinder as

---

[151](Doc. 236 at 38-39.)

[152]*Id.* at 31.

[153]*Id.* at 24-26.

[154](Doc. 236 at 33-41.)

[155]*Id.* at 38-39.

Government Exhibit 67.[156]  Knight also explained that Krull was unavailable to testify during the trial; she did not state that he had died.[157]

Given this factual backdrop, this Court rejects Nichols' claim.  First, Nichols could have subpoenaed Krull, but did not, and thus waived any right to confront him.  Second, even if he had cross-examined Krull, such examination would have been fruitless because Krull could not have testified to the results of his examination given the lack of evidentiary foundation for the so-called known print of Nichols, which was taken by the now-deceased jailer.  Third, because no foundation existed for Krull's testimony, or his report, his report was irrelevant and immaterial, and the government's alleged failure to turn it over was inconsequential.  Finally, even assuming that the government failed to turn over Government Exhibit 67 to Nichols before trial, Nichols does not allege, nor did such failure affect the result of the trial, and he fails to sustain his burden to show prejudice.  Accordingly, the Court finds that this claim lacks merit.

**4.      Failure to subpoena Damon Campbell**

Nichols argues that his counsel performed ineffectively because he failed "to Subpoena the alleged informant (Damon Campbell) to testify, or at least submit to an interview before the Suppression Hearing or at Trial."  He claims that if his counsel had interviewed Campbell, he "would have learned the traffic stop conducted on September 14, 2000 was a controlled 'traffic stop' orchestrated by Damon Campbell, and not a routine stop for traffic violation as alleged during the Suppression Hearing and during Trial by the government."  Nichols also alleges that his counsel was otherwise ineffective "for failing to call any civilian witnesses to rebut the facts

---

[156]*Id*. at 39-40.

[157]*Id*. at 38.

of the case as presented by the government," and lists Campbell as one such witness.

This claim is without merit. The Court agrees with the government that, even if the September 14, 2000 traffic stop was "orchestrated" by Campbell, this is constitutionally irrelevant. With or without Campbell's information, this stop was justified based on the fact that while following the vehicle, officers observed it traveling in excess of the posted speed limit and change lanes without signaling, both in violation of Missouri law.[158] An officer may initiate a traffic stop once he has "reasonable suspicion that criminal activity is, has, or is about to occur."[159] Here, the traffic violations provided reasonable suspicion for the stop, irrespective of any information provided by Campbell.[160] The fact that the agents had other motivations for stopping the vehicle that may have been grounded on information supplied by Campbell is irrelevant to the legality of the stop, which the Tenth Circuit Court of Appeals upheld.[161] Therefore, counsel did not perform ineffectively in failing to call or subpoena Campbell. Moreover, Campbell's testimony would have been irrelevant to the legality of the stop, and thus it could not have affected this Court's ultimate decision upholding the same. Accordingly, Nichols cannot sustain his burden to show either deficient performance or prejudice on this claim.

### 5. Failure to subpoena Sheneice Sanders

---

[158](Doc. 175 at 65-55.)

[159]*United States v. Copening*, 506 F.3d 1241, 1246 (10th Cir. 2007).

[160]*United States v. Gregoire*, 425 F.3d 872, 876 (10th Cir.2005) ("An observed traffic violation or a reasonable suspicion of such a violation under state law plainly justifies a stop.").

[161]*See id.* at 878 ("[T]he subjective motivation of the trooper is not pertinent given the observed [traffic] violation."); *Nichols I*, 374 F.3d at 964 ("In regard to the St. Louis stop, the district court found that prior to the stop, police had 'observed two traffic violations–speeding and a lane change without using a turning signal.' This finding is not clearly erroneous. The stop was thus justified at its outset.") (internal citation omitted).

Nichols likewise claims that "Sheneice Sanders should have been Subpoenaed to testify at the Suppression Hearing, or interviewed before Trial by Counsel James Chappas to ascertain the reliability of evidence to be used from the Search of the residence by the government in it[]s Case in Chief against Cordell Nichols."  This claim is without merit.

Even if Nichols' counsel ineffectively failed to subpoena Sanders, Nichols does not demonstrate that he was prejudiced by such failure.  He does not proffer what Sanders would have testified to, nor does he represent that she would have testified that she did not voluntarily consent to the search of her residence.  Because Nichols presents no basis for this Court to conclude that Sanders would have testified that she did not consent, he fails to sustain his burden to prove that this Court would have had any basis to find that she did not consent.  Further, even if she had so testified, Nichols cannot show by a preponderance of the evidence that this Court would have believed her testimony over the testimony of the officer who testified that she did consent.  Against her testimony, this Court would have weighed the testimony of the officer who obtained the consent, and no basis exists for this Court to conclude that this Court would have found Sanders more believable than the officer.[162]  Thus, Nichols fails to carry his burden to show prejudice by a preponderance of the evidence, and this claim fails.

6.      **Failure to challenge Sanders' consent**

Similarly, Nichols argues that his counsel was ineffective for failing to challenge Sanders' consent to search her residence.  He avers that "[t]he warrantless Search and Seizure of evidence from the residence of Cordell Nichols and Sheneice was conducted without consent, and violated the 4th Amendment."  Nichols claims that the agents "did forcefully coerce Ms.

---

[162](Doc. 173 at 74, 83.)

Sheneice Sanders to open the door and put a gun to her in a threatening manner to coerce her to allow them to search," and lied to her by "[s]tating they were investigating a 'murder' and implying the death of Cordell Nichols." As evidence for these claims, Nichols attaches an affidavit from Damon Campbell, dated October 20, 2004, attesting that these events occurred.[163]

The Court agrees with the government that this claim fails for lack of an evidentiary basis. Nichols does not submit an affidavit from Sanders, who is the only person in a position to state whether her consent was voluntary. Instead, Nichols submits an affidavit from Campbell, who admittedly was not present when Sanders consented.[164] Campbell does not represent that he witnessed her sign the consent form under any form of duress, but merely speculates on this point.[165] In any event, little basis exists to credit Campbell's representation that he was even at the residence; at the suppression hearing Detective Verhaeghe credibly testified that Campbell was not present.[166]

Even construed in the light most favorable to Nichols, these allegations do not establish that his counsel was deficient. Nichols does not establish even a probability that had counsel challenged her consent, he would have been successful, because he does not aver that Sanders herself would have testified that her consent was involuntary. Further, Nichols cannot establish such probability by relying on Campbell's affidavit because it is based on his opinion and

_____

[163](Doc. 350-3, Ex. C.)

[164]*See id.* at 9 (stating he took agents to Sanders' apartment; agents rushed in and handcuffed Sanders and her children began to cry; and he then "faded away on the steps and was followed by an agent to my vehicle.")

[165]*See id.* ("If Ms. Sanders signed a consent form it was more likely because she was in handcuffs and was in fear for her and her kids, but to know exactly the court would have to ask Shaniece Sanders how she came to sign a consent or give consent to search her residence."); *id.* ("any consent in my opinion was coerced and out of fear.")

[166]*See* Doc. 175 at 88.

conjecture about what might have happened. Accordingly, Nichols offers no plausible scenario for this Court to find that his counsel was deficient for failing to challenge the consent, or that he was prejudiced by such failure.

### 7. Denial of right to cross-examine Krull and Sanders

Nichols claims counsel failed to investigate and preserve the right to confront essential witnesses, and thus he was denied his constitutional right to confront Sanders and Krull. He avers, "[d]uring the jury trial the defendant was denied the right to challenge the testimonial evidence introduced against him offered by the government Agents in place of the actual witnesses, Sheneice Sanders and Thomas Krull."

Nichols points to no instance in the record where the government offered such evidence. In fact, the government did not offer any testimonial evidence during the trial attributable to Krull by way of hearsay.[167] As noted above, Knight testified that she compared the known fingerprints of Nichols on Government Exhibit 66 to the fingerprint on the grinder and determined that it was his fingerprint.[168] She explained that Krull had made a previous fingerprint comparison off of the old fingerprint card that had been obtained from Nichols by the now-deceased jailer, so she did another comparison with Government Exhibit 66.[169] Her reference to the fact that Krull made a previous fingerprint comparison was not hearsay because she did not refer to a statement made by Krull offered to prove the truth of the matter asserted. Had she referred to the result of his prior examination, that would have been inadmissible

---

[167]*See* Fed. R. Evid. 801(c) (" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.").

[168](Doc. 236 at 33-41.)

[169]*Id.* at 38-39.

hearsay, but she made no such reference.  Thus, Nichols was not denied any right "to challenge testimonial evidence" offered by the government with respect to Krull.

With respect to Sanders, the Court agrees with the government that Nichols invited the hearsay about which he now complains.  At trial, DEA Agent David Turner testified on direct examination as to what Sanders did, not what she said, when he went to her residence, which she shared with Nichols, and asked for consent to search.[170]  During his cross-examination of Turner, Nichols asked him if he coerced Sanders into consenting to the search.[171]  To rebut any inference of coercion, the government questioned Turner about the voluntariness of this consent on re-direct and elicited hearsay, to which Nichols objected:

> Q. All right. You didn't coerce consent out of Ms. Sanders, did you?
>
> A. No, sir. She was a very nice lady. Very cooperative.
>
> Q. Okay. You had her sign a waiver form, correct?
>
> A. Yes, sir.
>
> Q. And in that waiver form it says: I've been advised of my rights; I realize I have rights–
>
> MR. NICHOLS: I object to that, Your Honor, because Ms. Sanders is not here to testify to the signature of this letter whatsoever. So that's the same thing as I'm trying to present the affidavit to the Court and I could not–
>
> THE COURT: All right, just a minute. You asked whether this was coerced, and so this is a question in response to that so I'll

---

[170]*See* Doc. 235 at 276 ("We knocked at the door. Ms. Sanders greeted us. We explained to her our presence. She then signed a consent to search form and allowed us into the house to search.")

[171]*Id.* at 326 ("Q. I'm saying was there any coercion in this consent? A. Oh. No, Sir.".)

overrule the objection.[172]

Clearly, Nichols invited this testimonial hearsay as to what the consent form said by asking Turner whether he coerced Sanders to consent in the first instance. Nichols cannot now credibly complain about this error because he invited it.[173]

Even if this constituted a denial of Nichols' right to confront Sanders, however, he cannot show that he was prejudiced by any such denial. In fact, he could not have been prejudiced because the voluntariness of Sanders' consent was an irrelevant issue in Nichols' trial. The voluntariness of Sanders' consent could only have been relevant to Nichols' motion to suppress the evidence recovered from Sanders' residence, and, as previously discussed, this Court denied such motion before the trial. In contrast, at trial the voluntariness of Sanders' consent was irrelevant because this Court had already determined that the evidence found in the search of her apartment was admissible. Accordingly, this claim also fails.

### 8.      Speedy Trial violation

Nichols argues that counsel was ineffective because he failed to challenge the Indictment on Speedy Trial grounds and thus, he was denied "the right to a fast and Speedy Trial." Specifically, he claims that the government violated 18 U.S.C. § 3161(b), which requires that indictments be filed within thirty days of a defendant's arrest, and 18 U.S.C. § 3161(c)(1), which requires that a defendant be brought to trial within seventy days of being indicted. As to the former claim, the Court notes that the Sealed Indictment in this federal case was filed July 31,

---

[172]*Id.* at 331-32.

[173]*See United States v. Griffin*, 294 F. App'x. 393, 396 n.2 (10th Cir. 2008) ("There is authority holding that 'the admission of out of court statements by a government witness, when responding to an inquiry by defense counsel, creates 'invited error.' ") (quoting *United States v. Parikh*, 858 F.2d 688, 695 (11th Cir. 1988)).

2002, and defendant was arrested on those charges on August 2, 2002.  As to the latter claim,

Nichols notes "[t]he statute requires a defendant to be tried within (70) days of being indicted."

Nichols does not specifically articulate how his speedy trial rights were violated, nor does he

address the fact that he had three counsel appointed to represent him before proceeding to trial in

July 2003, all of whom filed numerous pretrial motions on his behalf that impacted excludable

time under the Speedy Trial Act.[174]

Moreover, because Nichols alleges statutory violations of his right to a speedy trial, as

opposed to a constitutional violation, his claim is not cognizable in the instant § 2255 context.

The Tenth Circuit decision in *United States v. Taylor*[175] squarely forecloses his claim.  There, the

court dismissed the defendant's claims alleging a violation of his statutory right to a speedy trial

in the § 2255 context, noting that the violation of a statutory right, as opposed to a constitutional

right, will not support issuance of a certificate of appealability.[176]  The court summarily denied

the defendant's claim that his rights under the Speedy Trial Act were violated.[177]  For the same

reason, this Court dismisses Nichols' speedy trial claims, which are both based on a claimed

violation of a statutory right.[178]

### 9. Failure to challenge validity of Indictment

---

[174]*See* 18 U.S.C. § 3161(h).

[175]454 F.3d 1075 (10th Cir. 2006).

[176]*Id*. at 1078-79 ("Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a COA may issue only when the applicant 'has made a substantial showing of the denial of a *constitutional* right'. . . . Thus, a COA cannot issue when the habeas petitioner has shown the denial of only a statutory right.") (quoting 28 U.S.C. § 2253(c)(2) (emphasis in original)).

[177]*See id*. at 1079.

[178]Alternatively, the Court finds that Nichols has not made any showing of prejudice as required under *Strickland*, because he makes no attempt to show that if his counsel had raised this claim he would have been successful and would have obtained a dismissal of the case with prejudice.

Nichols argues that his counsel was ineffective because he "failed to challenge a[n] indictment charging a non[] exist[e]nt crime of conspiracy because evidence presented to the grand jury was hearsay and competent." Nichols "submit[]s NO competent evidence was presented to the [Grand Jury] who issued the Superseding Indictment because Superseding Indictment issued from a different Grand Jury and from a different division than the original indictment."

The Court denies this claim. Nichols unreasonably infers that the evidence adduced before the second Grand Jury was not competent, both because it was issued "from a different Grand Jury and from a different division than the original indictment," and because different witnesses testified at the Grand Jury than at the suppression hearing. In fact, these circumstances are ordinary, not unusual, and do not justify any inference that the evidence presented was incompetent. Once empaneled, the Grand Jury serves until discharged by the court, generally for a term no longer than eighteen months.[179] The Grand Jury may return a superseding indictment any time before trial, and the prosecutor may submit evidence to succeeding Grand Juries.[180] Because these circumstances are facially ordinary and raise no specter of any sort of statutory or constitutional violation, Nichols' counsel was not ineffective for failing to challenge them. Finally, Nichols fails to show that he was prejudiced by these circumstances, or that they otherwise affected the result of his trial, which was based on competent evidence.

### 10. Failure to challenge sentencing enhancements under *Booker*

---

[179] *See* Fed. R. Crim. P 6(g) (eighteen-month term of grand jury begins at impanelment).

[180] *See* Fed. R. Crim. P. 6(e)(3)(C)(iii) (court order not necessary to transfer one grand jury's material to successor grand jury).

Nichols argues that "counsel was ineffective for failing to properly challenge the sentence enhancements as a violation of *United States v. [B]ooker*." He alleges that this Court impermissibly "engaged in judicial fact finding to determine that Mr. Nichols possessed a firearm in relation to a drug trafficking crime, and [o]bstructed justice." The Tenth Circuit has explained, however, that judicial fact-finding by a preponderance of the evidence remains constitutional post-*Booker* as long as the guidelines are advisory.[181] This Court noted at Nichols' March 27, 2006 sentencing hearing that the Sentencing Guidelines were advisory and applied them in an advisory manner.[182] Accordingly, this Court did not violate *Booker* by engaging in judicial fact-finding with respect to the sentencing enhancements, and Nichols cannot satisfy either prong under *Strickland*.

**11.    Failure to object to information in PSIR relating to firearm.**

Nichols argues that "[c]ounsel was ineffective for not objecting to the information in the PSIR that related to the firearm enhancement, during the first sentencing hearing, and the sentencing hearing held after remand from the Supreme Court." Specifically, Nichols argues that his counsel was ineffective for failing to object to paragraphs 24, 25, and 26 of the PSIR, which collectively state that the officers went to Sanders' residence, obtained her consent to search the residence, and found a loaded gun in a dresser drawer with heroin, found money, and that Sanders gave a written statement stating that these items belonged to Nichols, whom she

---

[181]*See United States v. Dalton*, 409 F.3d 1247, 1252 (10th Cir. 2005); *United States v. Magallanez*, 408 F.3d 672, 684-85 (10th Cir. 2005).

[182]*See* Doc. 300 at 14 ("A sentence of 360 months represents the middle of the advisory sentencing guideline range.").

stated was involved in drug trafficking.[183]  Although Nichols is correct that his counsel did not

object to these particular paragraphs, counsel did in fact object to application of the proposed

firearm enhancement at the September 8, 2003 sentencing hearing.  Likewise, at the March 27,

2006 sentencing hearing, his counsel again objected, claiming "there was insufficient evidence to

allow the Court to find by a preponderance of the evidence that he did in fact possess this

weapon in connection with a drug offense," and suggesting that the government was "required to

present some sort of evidence to allow the Court to find facts supporting that enhancement."[184]

In denying Nichols' objections at both hearings, this Court did not rely on the fact that

his counsel did not specifically object to paragraphs 24, 25, and 26.  At the September 8, 2003

hearing, this Court denied the objection, holding:

> All right. Then the defendant has filed objections. First an
> enhancement, two-level enhancement, for possession of a firearm.
> And that's the firearm that was found in the St. Louis apartment
> that the defendant resided in and that was the site of his heroin
> distribution operation. The firearms, there are actually two of
> them. One of them was found in the same dresser drawer as the
> heroin. And the other person that lived there, who was identified as
> the defendant's girlfriend, stated that this heroin and the gun
> belonged to the defendant. So there has been an establishment of
> temporal and spatial relationship between the firearms and the
> heroin for distribution.[185]

Likewise, at the March 27, 2006 hearing, this Court noted the objections and denied them, citing

the same reasons it had stated at the prior sentencing hearing.[186]  Neither of these denials was

---

[183](PSIR ¶¶ 24, 25, 26.)

[184](Doc. 300 at 11.)

[185](Doc. 264 at 39.)

[186](Doc. 300 at 12.)

based on counsel's failure to object to paragraphs 24, 25, and 26 of the PSIR.[187] Accordingly, even if his counsel performed deficiently in not objecting to these specific paragraphs, Nichols cannot sustain his burden to show that he was prejudiced by such deficient performance. Thus, Nichols cannot show that even if his counsel had objected to these paragraph, as opposed to simply posing a general objection as he did, this Court would have sustained his objection or otherwise treated it any differently.

### 12. Objection to the factual basis for firearms enhancement

Nichols also argues that this Court erroneously applied the firearms enhancement, suggesting that the firearms did not belong to him based on Campbell's affidavit:

> Petitioner further finds the enhancement to [sic] unreasonable for the evidence relied on by the Court is not contradicted by the statement of Damon Campbell the government's informant, who acknowledges that he hid items of drug evidence within the residence of Cordell Nichols. Although these items are not specifically identified in the Affidavit the Newly Discovered Evidence does challenge the factual basis of the Court's findings on the gun enhancement and the basis of the ruling during the suppression hearing.[188]

Although Nichols does not articulate how counsel was ineffective with respect to this issue, the Court rejects this claim. Damon Campbell does not acknowledge in the affidavit that he "hid items of drug evidence within the residence of Cordell Nichols" as Nichols claims. Rather, Campbell's affidavit is ambiguous on this point, stating, "I placed several items throughout the apartment which I do plead the fifth to. I placed items in various places

---

[187]*See* Doc. 235 at 305-06 (testimony of Agent Turner that one firearm was found in same dresser drawer as drugs; another was found in different drawer of same dresser).

[188](Doc. 350 at 19.)

throughout the residence . . . .";[189] and, "I was at Cordell Nichols Baby Mother's residence and I left several items there, with no one's knowledge, and I pled the 5th on this matter."[190]  Because Campbell does not admit to placing either the drugs or guns in Nichols' residence, this Court does not rely on Campbell's affidavits that he did so.

Further, this Court previously found that Campbell is not a credible affiant.  At the March 27, 2006 sentencing hearing, this Court considered Campbell's August 31, 2004 affidavit, which Nichols has attached to the instant motion as Exhibit D, and found that it was "ridiculous and unbelievable":

> The Court is also in receipt of an affidavit filed with this court on June 23, 2005. It's given document number 270-1. The affidavit was submitted by the defendant and signed by Damon Campbell, allegedly, the confidential informant involving the car stop on September 14, 2000. The affidavit appears to be written by the defendant and signed by Mr. Campbell when they were both at the Federal Medical Center in Forth Worth, Texas, on August 31, 2004. The Court observes and concludes that the story provided by Mr. Campbell in the affidavit is ridiculous and unbelievable, and appears to be another attempt by the defendant to manipulate the Court into granting him a new trial . . . [191]

This credibility finding applies equally to Campbell's October 20, 2004 affidavit, which is attached to Nichols' petition as Exhibit C.  Accordingly this claim is denied.

---

[189](Doc. 350, Ex. C at 12.)

[190]*Id*. Ex. D.

[191](Doc. 300 at 23.)

### 13.    Failure to Challenge Section 851 Enhancement

On September 13 and 23, 2010, Nichols moved to amend his motion to add a claim that counsel Chappas was ineffective for failure to challenge the government's § 851 Notice filed June 1, 2003,[192] and that counsel Stephen Kessler was ineffective for failing to challenge this issue at sentencing and on direct appeal.[193]  Nichols argues that this led to the Court erroneously enhancing his sentence based on a prior conviction.  These motions were filed long after the one-year period of limitations under § 2255 expired..  As the Supreme Court has explained, under Fed. R. Civ. P. 15, a habeas petitioner may amend his petition to add claims after the statute of limitations has expired, but those additional claims will not "relate back" if they did not arise out of the "conduct, transaction, or occurrence" set forth in his original timely filed petition.[194] Because the amended claim is factually and legally related to the claims regarding objections to sentencing raised in the original petition, the Court finds the amendment relates back to the original filing date under Rule 15(c) and is timely.[195]

Nevertheless, the Court denies the additional claim.  21 U.S.C. § 851(a)(1) provides, in relevant part:

> No person who stands convicted of an offense under this part shall be sentenced to increased punishment by reason of one or more prior convictions, unless before trial, or before entry of a plea of guilty, the United States Attorney files an information with the

---

[192](Doc. 182.)

[193](Docs. 385, 386.)

[194]*Mayle v. Felix*, 545 U.S. 644, 654-64 (2005); *United States v. Espinoza-Saenz*, 235 F.3d 501, 505 (10th Cir. 2000).

[195]*Id.* (stating that "an untimely amendment to a § 2255 motion which, by way of additional facts, clarifies or amplifies a claim or theory" may be permissible, but "only if the proposed amendment does not seek to add a new claim or insert a new theory into the case."

court (and serves a copy of such information upon the person or counsel for the person) stating in writing the previous convictions to be relied upon.

A district court cannot impose an enhanced sentence unless the government complies with § 851's requirements.[196]  As the Tenth Circuit has explained, "[g]enerally once § 851 notice is given, that is sufficient to satisfy the statute.  The purpose of a § 851 information is to "notify the defendant of the government's intention to use a prior offense to enhance his sentence,"[197] and to "give the defendant an opportunity to establish either that he had not been convicted of the crimes the government relies upon for the sentence enhancement or that the convictions do not qualify as the type satisfying the enhancement requirements."[198]  Additionally, § 851 notice enables the defendant to make an informed choice about whether to plead guilty or go to trial.[199]  Here, there is no question the government filed the Information prior to start of trial, albeit the day before.

Nichols now argues that his counsel was ineffective for failing to object on the grounds that simple possession alone is not enough to trigger the enhanced sentence under § 851.  In support of his argument, Nichols cites the case of *United States v. Kissick*,[200] where the Tenth Circuit granted the petitioner's § 2255 motion because his counsel failed to object to the application of an inapplicable enhancement, resulting in an increased sentence and the requisite prejudice under *Strickland*.  The petitioner in that case was convicted on a § 841(a) drug

---

[196]*See United States v. LaBonte*, 520 U.S. 751, 754 n.1, 759-60 (1997).

[197]*United States v. Vaughn*, 370 F.3d 1049, 1055 (10th Cir. 2004).

[198]*United States v. Willis*, 102 F.3d 1078, 1085 (1996).

[199]*United States v. Balderama-Iribe*, 490 F.3d 1199, 1205 (10th Cir. 2007) (citation omitted).

[200]69 F.3d 1048 (10th Cir. 1995).

possession with intent to distribute charge and was classified as a career criminal under § 4B1.1 of the United States Sentencing Guidelines.[201]  In granting the petitioner's motion, the court explained that a prior conviction for mere possession of a controlled substance, without the intent to distribute, does not meet the definition of a "controlled substances offense" as the term is used in § 4B1.2.[202]  By contrast, although the penalty for Nichols' drug possession count was enhanced to a twenty-year mandatory minimum because of his prior felony drug conviction, he was not classified as a career offender.  The language of § 841(b)(1)(A) only requires "two or more prior convictions for a felony drug offense," meaning a drug offense subject to a term of over one year imprisonment.[203]  There is no question Nichols' prior conviction was for possession of cocaine, for which he received a two-year sentence.[204]  Accordingly, the § 851 enhancement to the mandatory minimum of twenty years was appropriate, and Nichols cannot satisfy either prong under *Strickland*.

In summary, the record conclusively demonstrates that Nichols' § 2255 motion must be dismissed without further discovery or an evidentiary hearing.

## V.    Certificate of Appealability

Effective December 1, 2009, Rule 11 of the Rules Governing Section 2255 Proceedings requires the Court to grant or deny a certificate of appealability ("COA") when making a ruling adverse to the petitioner.  "A certificate of appealability may issue . . . only if the applicant has

---

[201]*Id.* at 1050.

[202]*Id.* at 1053-54; *see also United States v. Horey*, 333 F.3d 1185, 1188 (10th Cir. 2003) (same).

[203]21 U.S.C. § 802(44); *see United States v. Harris*, 223 F. App'x 747, 756 (10th Cir. 2007); *United States v. McGehee*, 177 F. App'x 815, 824-826 (10th Cir. 2006).

[204](Doc. 386, Ex. A.)

made a substantial showing of the denial of a constitutional right."[205]  A petitioner may satisfy

his burden only if "reasonable jurists would find the district court's assessment of the

constitutional claims debatable or wrong."[206]  A petitioner is not required to demonstrate that his

appeal will succeed to be entitled to a COA.  He must, however, "prove something more than the

absence of frivolity or the existence of mere good faith."[207]  "This threshold inquiry does not

require full consideration of the factual or legal bases adduced in support of the claims.  In fact,

the statute forbids it."[208]  For the reasons detailed in this Memorandum and Order, Nichols has

not made a substantial showing of the denial of a constitutional right, and the Court denies a

COA as to its ruling on his § 2255 motion.

**IT IS THEREFORE ORDERED** that Nichols' Motions to Expand the Record and  to

Amend/Correct his § 2255 motion (Docs. 357, 385, 386) are GRANTED;

**IT IS FURTHER ORDERED** that Nichols' motion to vacate pursuant to 28 U.S.C. §

2255 (Doc. 350), as supplemented and amended, is DENIED; Nichols is also denied a COA;

**IT IS FURTHER ORDERED** that Nichols' Motions for Discovery (Docs. 357, 358,

367), Motion for Summary Judgment (Doc. 371) and Motion for Evidentiary Hearing (Doc. 372)

are DENIED.

**IT IS SO ORDERED.**

Dated: <u>October 28, 2010</u>

---

[205]28 U.S.C. § 2253(c)(2).  The denial of a § 2255 motion is not appealable unless a circuit justice or a circuit or district judge issues a certificate of appealability.  *See* Fed. R. App. P. 22(b)(1); 28 U.S.C. § 2253(c)(1).

[206]*Saiz v. Ortiz*, 393 F.3d 1166, 1171 n.3 (10th Cir. 2004) (quoting *Tennard v. Dretke*, 524 U.S. 274, 282 (2004)).

[207]*Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003).

[208]*Id.* at 336; *see also United States v. Silva*, 430 F.3d 1096, 1100 (10th Cir. 2005).

_S/ Julie A. Robinson_
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE